IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| VEENU MEHTA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:07-cv-1257 (AJT/TRJ) |
| | ) |
| | ) |
| JOHN E. POTTER, | ) |
| Postmaster General of the United States | ) |
| Postal Service, a Federal Agency, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION

This case is before the Court on the Motion for Summary Judgment filed on

behalf of the Postmaster General of the United States Postal Service ("Postal Service").

Plaintiff Veenu Mehta ("Mehta") claims that in January 2005, and again in 2006,

she sustained an on-the-job back injury that limited her ability to perform her job as a

letter carrier. From the time of her injury in January 2005, Mehta and her supervisors had

a number of disputes regarding the scope of the work she was medically cleared to

perform as a result of that injury. Mehta and the Postal Service also had disputes

regarding her absences from work, culminating in Mehta's termination in September

2007. That termination was the subject of an arbitration proceeding under her union's

collective bargaining agreement and Mehta was reinstated in November 2007. Following

her reinstatement, Mehta filed this action,[1] alleging claims for hostile work environment under the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* and unlawful retaliation under Title VII, 42 U.S.C. § 2000e-3 for engaging in protected activity. The Postal Service argues that it is entitled to summary judgment based on the undisputed facts because:

(1) Mehta cannot establish that she is disabled within the meaning of the Rehabilitation Act;

(2) Mehta cannot show that the conduct she alleges as hostile on the part of her supervisors is based on her disability or is sufficiently severe or pervasive to rise to the level of a violation of the Rehabilitation Act;

(3) Mehta cannot establish a *prima facie* retaliation case with respect to any of the allegedly retaliatory acts; and

(4) Mehta cannot rebut the Postal Service's legitimate, non-retaliatory reasons for her supervisors' actions even if she can make out a *prima facie* case of retaliation, nor can she establish that those legitimate reasons were a pretext for unlawful retaliation.

The Court heard oral argument on this motion on February 27, 2009, following which the Court vacated the scheduled trial date pending the Court's ruling on this motion, and ordered Mehta to respond specifically to the Postal Service's Statement of Undisputed Facts,[2] which she did on March 6, 2009. Pl.'s Am Counter Statement of

---

[1] Mehta filed two lawsuits. Civil Action No. 1:07-cv-1257 was filed on December 14, 2007 and Civil Action No. 1:08-cv-220 was filed on March 16, 2008. Both actions were consolidated into the present action.

[2] Mehta's initial opposition to the Postal Service's Motion for Summary Judgment failed to respond specifically to the facts stated in the Postal Service's brief. Pl.'s Opp. to Def. Mot. for Summ. J. (Doc. No. 54). On March 6, 2009, Mehta filed her "Amended Counter Statement of Facts in Support of her Opposition to Defendant's Motion for Summary

Facts in Supp. of Opp. to Def. Mot. for Summ. J (Doc. No. 77).[3]   Based on those

submissions, as well as the Court's own review of the documents and declarations

submitted in connection with the summary judgment motion, the Court hereby grants

Defendant's Motion for Summary Judgment.

## I. BACKGROUND

Mehta began working as a letter carrier for the U.S. Postal Service's Springfield,

Virginia office in 1998.  Compl. No. 07-1257, at ¶ 12.  As a letter carrier, Mehta is

required to carry and case mail.[4]  The performance of these duties ordinarily involves

lifting, walking, bending, stooping, standing, pulling, and twisting.

On February 28, 2005, Mehta filed a notice of injury claim, Form CA-1,  with the

Department of Labor in which she stated that she was delivering mail on January 21,

2005 when she began experiencing discomfort in her back.  Def. Mem. in Supp. of

Summ. J. ("Def. Br."), Ex. 4 (Doc. No. 50).  Mehta did not immediately report her

January 21, 2005 injury to her supervisors as required by Postal Service rules and

regulations.  See Def. Br., Ex. 9.  Rather, she called in sick the day after her injury and

was not scheduled to report to work until Monday, January 31, 2005.  Decl. of Veenu

Mehta ("Mehta Decl.") at 1, ¶ 5.  On January 31, 2005, Mehta finally reported the back

---

Judgment," which contained, as the Court ordered, a paragraph by paragraph response to
the statement of facts included in the Postal Service's brief.  In addition, Mehta filed a
Declaration that includes a substantial number of statements and contentions that are not
based on personal knowledge and also statements about her medical condition that are
based on her own subjective assessment of her condition.  Declaration of Veenu Mehta
(Doc. No. 56).

[3] Attached as an Appendix is a list of facts from the Postal Service's brief that Plaintiff
has admitted.

[4] "Casing mail" refers to the process of sorting mail before it is delivered.

injury she sustained on January 21. *Id.* at 2, ¶ 6. The next day, February 1, 2005, Mehta went to her doctor, who "gave me a week off." *Id.* at 2, ¶ 8. She then returned to work on February 7, 2005. *Id.* at 2, ¶ 11. Upon her return, Mehta requested that she be assigned duties reflective of what she claimed were her physical limitations. In March 2005, Mehta began submitting CA-17 "Duty Status Report" Forms ("CA-17 form"). *Id.* at 5, ¶ 33. A CA-17 form, typically completed by a physician, requests a description of claimed injuries and restrictions in physical activity as a result of those injuries. Because of Mehta's claim that she is disabled within the meaning of the Rehabilitation Act, it is necessary to trace in some detail the history of her reported physical limitations as set forth in the CA-17 forms she submitted to the Postal Service.

On March 22, 2005, Mehta submitted a CA-17 form stating the following restrictions:

| Lifting/carrying 3 lbs. | 8 hours intermittent |
|---|---|
| Walking | 8 hours intermittent |
| Standing | 8 hours intermittent |
| Fine manipulation | 2 hours intermittent |
| Climbing | 8 hours continuous |
| Driving a vehicle | 8 hours intermittent |
| Reaching above shoulders | 8 hours intermittent |
| Kneeling, bending, stooping | 8 hours intermittent |
| Twisting | 8 hours intermittent |
| Pushing/pulling | 2 hours intermittent |
| Simple grasping | 8 hours intermittent |
| Sitting | 1 hour continuous |

Def. Br., Ex. 10. Based on this form, Mehta was offered a "modified duty assignment (light duty)" which directed her to engage in these activities to the extent outlined in the CA-17 form. *Id.*, Ex. 11. This offer stated the following physical requirements:

| | |
|---|---|
| Lifting/carrying 3 lbs. | 8 hours intermittent |
| Walking | 8 hours intermittent |
| Standing | 2 hours intermittent |
| Fine manipulation | 8 hours intermittent |
| Climbing | 3 hours continuous |
| Driving a vehicle | 4 hours intermittent |
| Reaching above shoulders | 6 hours intermittent |
| Kneeling, bending, stooping | 2 hours intermittent |
| Twisting | 4 hours intermittent |
| Pushing/pulling | 2 hours intermittent |
| Simple grasping | 8 hours intermittent |
| Sitting | 1 hour continuous |

*Id.* Mehta rejected this offer and told her supervisors that she "need[ed] to take this limited offer to my doctor and check with him." *Id.* She then submitted a new CA-17 form signed by her physician, Dr. Spencer Tseng, which was dated March 30, 2005. Def. Br., Ex. 12. This form differed from the March 22 CA-17 form in the following respects: (1) the March 30 form stated that Mehta could grasp and conduct fine manipulation for eight hours per day (rather than two hours); (2) the March 30 form stated that Mehta could reach above her shoulder for two hours per day (rather than eight hours

intermittent); and (3) the March 30 form stated that Mehta could drive a vehicle for four hours per day (rather than eight hours intermittent). *Id.* She also provided a letter signed by Dr. Tseng in which he stated that he had seen Mehta and that she was "limited by pain on several activities." Def. Br., Ex. 13. Dr. Tseng also indicated that Mehta was "not to case or carry mail at this time and would benefit from desk duty." *Id.*

Much of what followed leading up to this lawsuit relates to disputes that arose concerning (1) whether Mehta's January 21, 2005 back injury occurred while she was on the job and is therefore a job related injury for compensation purposes; (2) what duties Mehta could perform in light of her back injury; and (3) Mehta's unexcused absences from work, her supervisors' efforts to determine whether she would be coming to work, and disciplinary actions taken against her for not reporting to work.

With respect to the cause of her January 21, 2005 back injury, Mehta's supervisors claim that Mehta initially told them that the injury did not occur while on the job. Def. Br. at 5. Mehta claims that the injury occurred while working, that she never claimed otherwise, and that her supervisors were lying about what she said. Mehta Decl. at 4, ¶ 29. In any event, the Postal Service initiated an investigation through the Office of the Postal Inspector and the Office of Inspector General ("OIG") concerning whether Mehta was falsely claiming a work related injury. This investigation resulted in extensive interviews of Mehta. *Id.* at 4, ¶ 25.[5]

There were also involved interactions on a regular basis between Mehta and her supervisors concerning whether Mehta had completed the CA-17 forms, the extent of

---

[5] The investigation was unable to substantiate the allegation that Mehta's injury was an off the job injury. The investigation was closed in August 2005. *See* Def. Br., Exs. 182, 183, 184.

Mehta's doctor-imposed work restrictions, whether Mehta had been assigned duties consistent with those restrictions, and whether there was work available for Mehta that complied with those restrictions. For example, the CA-17 forms Mehta submitted in 2005 show that her condition worsened initially but then improved. *See* Def. Br., Exs. 15, 18, 23. By July 2005, her condition continued to improve and x-ray examinations revealed no abnormalities in her vertebral bodies, joint spaces, bones, or soft tissue in her back. *Id.*, Exs. 20, 21. On July 10, 2005, Dr. Tseng described Mehta's symptoms as consistent with "myofascial pain and muscle strain." Def. Br., Ex. 21. CA-17 forms submitted after July 2005 show Mehta's continued improvement. On August 15, 2005, Mehta submitted a CA-17 form that indicates that she was able to carry five to ten pounds all day, stand continuously for three hours per day, walk intermittently for three hours per day, twist intermittently for two hours per day and reach above her shoulders continuously for three hours per day, and otherwise meet the physical requirements of her job for sitting, climbing, kneeling, bending, stooping, pulling, pushing and driving a vehicle. *Id.*, Ex. 23.

The issues concerning the extent of Mehta's physical limitations were accompanied by issues pertaining to Mehta's unexcused absences from work. From October 2005 to July 2007, Mehta had thirty unexcused absences or tardies assessed against her and had been disciplined several times in connection with her absenteeism. *See* Def. Br., Exs. 57, 58, 59, 60, 61. The first such discipline occurred on September 13, 2005, when her first-line supervisor, Chi "Erick" Yim ("Yim"), issued Mehta a "Letter of Warning" for

absences that occurred between July 9, 2005 and August 27, 2005.[6] *Id.*, Ex. 57. Mehta filed a formal complaint with the Postal Service's Equal Employment Opportunity Office ("EEO") on September 19, 2005, alleging that her supervisors had discriminated against her on the basis of her race, gender, and disability. Def. Mem. in Supp. of Mot. to Dismiss (Doc. No.12), Ex. 5. Nevertheless, matters seem to have settled down until approximately nine months later when Mehta told her supervisors that she had again injured her back while conducting an inspection of her vehicle. Mehta Decl. at 9, ¶ 57. The disputes that followed again revolved around the extent to which Mehta's condition limited her ability to perform her job and her unscheduled absences from work.

Mehta's July 26, 2006 CA-17 form indicated that her condition had improved to the point where she could lift ten pounds for four hours continuously, and fifteen pounds intermittently, twist intermittently for one hour per day, reach above her shoulders for three hours per day, not carry for more than four hours per day, and otherwise perform all of her job duties. Def. Br., Ex. 36. However, shortly thereafter, in early August 2006, Mehta submitted a CA-17 form that indicated a significant reduction in her physical capabilities. *Id.*, Ex. 37. Specifically, the Report signed by Dr. Tseng, based on an examination of Mehta that occurred on July 31, 2006, stated that she should lift only five pounds for only one hour intermittently and that she should engage in "sedentary work." *Id.* On August 15, 2006, a Postal Service physician wrote to Dr. Tseng to seek clarification as to the substantial deterioration in Mehta's described physical capabilities.

---

[6] These absences included a tardy on July 9, 2005; emergency annual leave on July 22, 2005; annual leave in lieu of sick leave on July 23, 2005; an absence on August 23, 2005 when Mehta called in sick and told Yim that she was using "FMLA;" and on August 27, 2005, an absence when Mehta called Yim to tell him that she was taking leave due to "stress." Def. Br., Ex. 57; Pls.' Exs. 51, 52.

Def. Br., Ex. 39. The Postal Service never received a response from Dr. Tseng. *See* Def. Br. at 9, ¶ 15; Pl.'s Am. Counter Statement of Facts at 4, ¶ 15.

At this point, Mehta's supervisors continued to offer Mehta modified assignments, which triggered involved, weeks-long interactions between Mehta and her supervisors about what duties Mehta could perform without violating her restrictions. For example, based on CA-17 forms that Mehta submitted,[7] Mehta's supervisors gave her an offer of modified assignment that required her to deliver mail for four hours per day. Def. Br., Exs. 44, 45. Mehta declined the offer on the grounds that the requirement to case her route (that is, sort mail for her route before it was delivered) and then deliver mail for four hours per day exceeded her limitations on carrying and pulling. *Id.*, Ex. 45. Mehta then returned to her doctor who filled out another CA-17 form with notations reflecting precisely what duties Mehta could perform, as opposed to what her physical restrictions were. Def. Br., Ex. 46. A dispute then continued between Mehta and her supervisors based on the Postal Service's position that it was the Postal Service's prerogative, and not her physician's, to determine how to formulate her job duties to meet her physical restrictions.

These disputes were again accompanied by Mehta's unauthorized absences and Mehta was disciplined based on those absences. Specifically, on November 28, 2006, her supervisor, Erick Yim, issued Mehta a "Letter of Warning" for being absent without leave ("AWOL") from October 30, 2006 to November 2, 2006. Def. Br., Ex. 58. On

---

[7] These CA-17 forms indicate that Mehta could lift ten pounds for three hours per day intermittently, stand for three hours per day, walk for two hours per day intermittently, climb for two hours per day intermittently, reach above her shoulder three hours per day, drive a vehicle four hours per day intermittently, and otherwise perform her job duties, except that she could not kneel, bend, twist or stoop at all. *See* Def. Br., Exs. 44, 46, 48.

March 29, 2007, Yim issued a "Notice of Seven Day Paper Suspension" for unsatisfactory attendance and failure to meet attendance requirements in February and March 2007. Def. Br., Ex. 59. On June 28, 2007, Mehta was issued a "Notice of Fourteen (14) Day Paper Suspension" for unscheduled absences occurring between April 10, 2007 and May 22, 2007.[8] Def. Br., Ex. 60. In the three weeks that followed the issuance of this fourteen day paper suspension, Mehta had five more occasions of unscheduled absences. Based on Mehta's entire disciplinary record, Yim issued Mehta a "Notice of Removal" on July 11, 2007, that is, a notice of termination from employment. Def. Br., Ex. 61.

Certain issues surrounded the absences that form the basis of these disciplinary actions. One was whether Mehta was properly assessed absences in light of what she claims were orders by Yim to leave work and not return until she obtained current CA-17 forms. The second was whether Mehta could claim leave under the Family and Medical Leave Act ("FMLA") when she left work after claiming that she was too "stressed out" to work and needed to take "stress leave." Mehta Decl. at 10, ¶ 6. With respect to this issue, the Postal Service claimed that Mehta had not accrued enough hours to trigger FMLA benefits and in any event had not requested FMLA leave. In response, Mehta claimed that she had not accrued enough hours for FMLA leave only because she had been improperly denied work and sent home. See Pl.'s Am. Statement of Facts at ¶ 24; see also Def. Br., Ex. 50. In September 2007, Mehta challenged the Notice of Removal

---

[8] All of Mehta's suspensions were "paper" suspensions. A paper suspension is a form of discipline in which Mehta's absences were documented, but allowed Mehta to report to work and retain full pay and benefits.

through proceedings afforded to her under her union's collective bargaining agreement.[9] On November 7, 2007, an arbitrator set aside the removal order and ordered that Mehta be allowed to return to work with all pay and benefits restored.[10] Pl.'s Ex. 190. On December 14, 2007, Mehta filed her complaint in this action. Complaint No. 1:07-cv-1257 (Doc. No. 1).

## II. STANDARD OF REVIEW

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to

---

[9] Mehta filed numerous complaints with the Department of Labor ("DOL"). Mehta also sent letters to various Postal Service and DOL officials concerning her disputes over incidents that occurred from August 2006 through August 2007. *See* Pl.'s Exs. 95-111, 178, 179. On March 16, 2007, she also filed a grievance with respect to a change in her work schedule as part of an offer of a modified duty assignment, which was resolved in her favor on April 23, 2007. Pl.'s Ex. 115.

[10] The Arbitrator sustained Mehta's grievance in part and denied it in part. The Arbitrator found that the Postal Service had the burden to establish "just cause" for Mehta's removal and that in order to establish "just cause" for her termination, there must be proof that under the totality of the circumstances the penalty imposed is reasonable for the proven misconduct. In evaluating whether the penalty is reasonable, the Arbitrator found that the "just cause" standard "favors progressive discipline that affords an employee the opportunity to modify behavior before more severe discipline up to and including removal is imposed." Pl.'s Ex. 190 at 20. Because an earlier internal Department of Labor investigation had found that the Postal Service had not forwarded Mehta's job offers to the Injury Compensation Office for suitability before presenting them to Mehta and that certain of the job offers were not within Mehta's restrictions, it was improper to send Mehta home when she refused to work outside her restrictions. The Arbitrator concluded:

> By sending [Mehta] home instead of providing her Limited Duty Assignments within her medical restriction, management treated such none[sic] work time as LWOP, and therefore contributed to and/or exasperated any attendance related problems for which she was issued the 14 day suspension and the removal action. For those reasons the removal was not for just cause.

*Id.* The Arbitrator denied Mehta's grievance that she was wrongfully denied FMLA benefits and that she was entitled to certain appeal rights as a veteran.

any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986). Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be considered. *Id.* at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted). *Anderson*, 477 U.S. at 249-50; *Holland v. Wash. Homes Inc.*, 487 F.3d 208, 213 (4th Cir. 2007). In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

### A. Mehta's Hostile Work Environment Claim

In order to prevail on a hostile work environment claim, a plaintiff must prove that (1) she is a qualified individual with a disability; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was

sufficiently severe or pervasive to alter a term, condition or privilege of employment; and (5) there is some factual basis for imputing liability to the employer. *Fox v. GMC*, 247 F.3d 169, 177 (4th Cir. 2001).

Whether an employee meets the definition of a "disability" under the Rehabilitation Act, and can therefore bring a claim under the statute, is a question of law for a court, not a question of fact for a jury. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 268 (4th Cir. 2001). The standards used to determine whether an employee has discriminated under the Rehabilitation Act are the standards applied under the Americans with Disabilities Act of 1990 ("ADA").[11] *Id.* The ADA defines a disability as (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment.[12] 29 U.S.C. § 705(20)(B). "Substantially limits," as interpreted under the ADA, "means that the impairment must 'significantly restrict' an individual's ability to perform a wide range of jobs." *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir. 1997).

It is well-settled that a back condition of the type described by Mehta could qualify as an "impairment" for purposes of the Rehabilitation Act. *See Toyota Motors Mfg. v. Williams*, 534 U.S. 184, 194-95 (citing 45 C.F.R. § 84.3(j)(2)(1)). However, "merely

[11] This Court is aware of the recent amendments to the Americans with Disabilities Act, which became effective on January 1, 2009. While the Court understands that these new amendments have broadened the scope and protection of the ADA, the Court is nonetheless obligated to apply the law that existed at the time of the alleged violations. *See E.E.O.C. v. Agro Dist., LLC*, No. 07-60447, 2009 U.S. App. LEXIS 959 (5th Cir. Jan. 15, 2009)

[12] Mehta does not claim that she has a record of an impairment nor does she claim that she was regarded as having an impairment. Rather, Mehta claims that she is disabled because she "has been significantly limited in one or more major life activities." Pl.'s Br. in Opp. to Def. Mot. for Summ. J. at 38.

having an impairment does not make one disabled for purposes" of the Rehabilitation Act; it must substantially limit a "major life activity." *Id.* at 195. The Fourth Circuit, as well as district courts within this Circuit, have considered whether back-related injuries constitute a "disability" under the ADA. In *Halperin*, the plaintiff sustained a back injury that prevented him from working for several months. The plaintiff's physician later cleared him to return to work with the restriction that he refrain from lifting more than twenty pounds. *Id.* at 195. When the plaintiff eventually returned to work, his employer terminated him because of a downturn in business. The plaintiff then sued his former employer under the ADA and the Age Discrimination Employment Act. On appeal from the district court's grant of summary judgment, the Fourth Circuit analyzed whether the plaintiff was disabled under the ADA. The Court stated:

> Applying the protections of the ADA to temporary impairments, such as the one presented here, would work a significant expansion of the Act. The ADA simply was not designed to protect the public from all adverse effects of ill-health and misfortune. Rather, the ADA was designed to "assure[] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." Extending the statutory protections available under the ADA to individuals with broken bones, sprained joints, sore muscles, infectious diseases, or other ailments that temporarily limit an individual's ability to work would trivialize this lofty objective.

*Id.* at 200. (citations omitted). Thus, the Court found that the plaintiff was not disabled because his back injury was not a permanent condition. The Court also found that the plaintiff was not precluded from "performing a wide range of jobs." *Id.* For those reasons, the Court ultimately determined that "no reasonable jury could conclude that Halperin's back injury significantly restricted his ability to work." *Id.*

Similarly, in *Hockaday v. Brownlee*, 370 F. Supp. 2d 416 (E.D. Va. 2004), the plaintiff sued the Department of the Army and the Secretary of Defense for

discrimination on the basis of a disability. The plaintiff had undergone reconstructive knee surgery, and as a consequence, missed a significant amount of time away from work. The plaintiff eventually obtained authorization to return to work. The authorization, however, specified that the plaintiff "was not to climb a ladder, negotiate more than one flight of stairs, squat, kneel, or lift more than twenty-five pounds." *Id.* at 419. In ruling on the defendant's motion for summary judgment, the court concluded that a "'disability' does not include a temporary medical condition, even if the condition requires an extended leave of absence from work." *Id.* at 423. The court also found that "the ability to lift a certain amount of weight, crawl, kneel, squat, or climb, are not major life activities." *Id.* Ultimately, the court found that the Secretary was entitled to summary judgment because the plaintiff was not "substantially limited in the major life activity of working." *Id.* at 424.

In another case, *Papproth v. E.I. DuPont De Nemours & Co.*, 359 F. Supp. 2d 525 (E.D. Va. 2005), the plaintiff claimed that her arthritis substantially limited her ability to work. When the plaintiff received an unsatisfactory evaluation from her work team, the plaintiff submitted her resignation. *Id.* at 527. The plaintiff claimed that her team had created a hostile work environment and had constructively discharged her by telling her to "do the work, resign, or make another mistake and get fired." *Id.* The plaintiff sued her employer, alleging that the company discriminated against her in violation of the ADA. On summary judgment, the court held that the plaintiff's arthritic condition was not a disability within the meaning of the ADA. *Id.* at 530. As in *Halperin*, the court found that the plaintiff's medical condition did not "significantly restrict her ability to perform a wide range of jobs." *Id.*; *see also Gallimore v. Newman Machine Co.*, 301 F.

Supp. 2d 431, 446 (M.D.N.C. 2004) (a substantial limitation on the major life activity of working does not exist where the plaintiff has the ability to stand or walk for one hour or more). Cases from other circuits are in accord. *See Mays v. Principi*, 301 F.3d 866, 869-70 (7th Cir. 2002) (the inability to lift more than ten pounds does not substantially impact a major life activity); *Mellon v. Federal Express Corp.*, 239 F.3d 954, 957 (8th Cir. 2001) (the plaintiff's inability to lift fifteen pounds did not constitute a disability).

These cases show that Mehta is not disabled within the meaning of the ADA. First, Mehta's limited ability to perform the specific duties of a letter carrier does not by itself bring her within the protection of the ADA, and by extension, the Rehabilitation Act. The record does not contain any evidence that Mehta's impairments exclude her from a "wide range of jobs." At best, Dr. Tseng's reports only show that Mehta experienced difficulty in fully performing the specific tasks of a letter carrier. Relevant ADA regulations are clear that "the inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *See* 29 C.F.R. § 1630.2(j)(3)(I). Thus, Mehta is not disabled within the meaning of the statute simply because of the restrictions imposed by her back condition.

Second, there is no evidence from which one may conclude that Mehta's injury was a permanent limitation. Mehta did not report any back-related problems between August 2005 and June 2006. Even when she reported another back injury in June 2006, the several CA-17 forms she submitted demonstrate that her condition improved in the ensuing months. Because Mehta's injury does not bar her from a wide range of employment and does not constitute a permanent condition, Mehta is not disabled within

the meaning of the ADA and the Rehabilitation Act. Accordingly, Mehta's hostile work environment claim fails.

Even assuming that Mehta is disabled within the meaning of the Rehabilitation Act, the record before the Court establishes that Mehta was not subjected to the required level of severe and pervasive harassment as a result of her alleged disability. It is evident from Mehta's deposition and her Declaration that the conduct she complains of related to disagreements over whether she properly complied with Postal Service regulations pertaining to absences and whether the Postal Service's offers of limited duty assignments were within the scope of her CA-17 forms. The record shows that these disputes were accompanied by isolated instances of, at most, rude treatment and harsh, non-obscene, non-vulgar language. The evidence does not establish that her treatment rose to the level of a "hostile or deeply repugnant" work environment. *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir.1996). Rather, the facts of this case put her treatment, at best, into that category of routine differences of opinion and personality conflicts with superiors that often occur in the workplace, even if those encounters resulted in bruised or wounded feelings. *See E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306 at 315-16 (4th Cir. 2008).

**B.      Mehta's Claim for Retaliation**

In order to make out a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her; and (3) a causal connection existed between the protected activity and the asserted adverse action. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F. 3d 253, 258 (4th Cir. 1998). Once a plaintiff has established a *prima facie* case of retaliation, an

employer may rebut this initial showing by articulating a non-discriminatory reason for the adverse employment action. *Id.* If an employer articulates such a reason, the burden shifts back to the plaintiff to show that the explanation for the action was a pretext for retaliation. *Id.*

### 1. *Prima Facie* Case of Retaliation

#### (a) Protected Activity

Mehta engaged in various protected activities, including the filing of an EEO complaint on September 19, 2005 and the filing of other complaints with the Postal Service or the Department of Labor. In order to be protected under the statute, Mehta does not need to prove the merits of her underlying claim, but only that she acted under a good-faith, reasonable belief that a violation existed. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074 (3d Cir. 1986). The Postal Service does not dispute that Mehta engaged in such activity. Thus, the Court finds that Mehta engaged in a protected activity within the meaning of 42 U.S.C. § 2000e-3.

#### (b) Adverse Employment Action

Mehta has offered evidence that her employer has taken an adverse employment action against her. Specifically, Mehta has provided evidence that she was subjected to several pre-disciplinary interviews, given "paper" suspensions, and a letter of warning for absenteeism, all of which led to her eventual termination. *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 775 (4th Cir. 1997) (noting that an employee's termination qualifies as an adverse action). This evidence establishes that Mehta was the subject of an adverse employment action.

### (c)    Causal Connection

In order to establish a *prima facie* case of retaliation, Mehta is required to present evidence of a causal connection between the materially adverse employment actions taken against her and her protected activity. In order to carry her burden, Mehta may present either direct or circumstantial evidence. In her effort to carry this burden, Mehta claims both direct and circumstantial evidence of a causal relationship between her employer's adverse actions and her protected activity. First, as to direct evidence, Mehta alleges that the following alleged statements by her second-level supervisor, Cindy Mitchell ("Mitchell"), constitutes threats to take retaliatory action against her for engaging in protected activity:

- On October 24, 2006, Mehta told Mitchell that she did not want to answer certain questions for a form that Mitchell was completing.[13] Mitchell stated: "You're making things hard for yourself." Mehta Dep. at 129:22-25, 130:1-2. (Doc. No. 56).

- On December 29, 2006, Mehta testified that she told Mitchell that she was going to call the Office of the Inspector General if she did not receive her desired modified duty request. Mitchell responded: "Whatever, do what you want. Do I look scared to you? Whatever. If you're not going to accept this job offer, you know, I'm going to get your claim denied."[14] *Id.* at 125:19-25, 126:1-6.

---

[13] Mehta's testimony does not state what form Mitchell was filling out, what information Mitchell requested from Mehta, or why Mitchell was completing the form.

[14] Mehta does not make clear what "claim" Mitchell was referring to, but it appears from the context of the transcript to refer to Mehta's claim for workers' compensation. In any event, the burden is on Mehta to establish the existence of a causal connection.

- On February 16, 2007, Mehta claims that she told Mitchell that she had "a FMLA on file." Mitchell responded: "You mean nothing to me. Get that through your head . . . Yeah, I'll give you FMLA. No FMLA for you period." *Id.* at 127:9-15.

- In early 2008, Mehta told Mitchell that she was going to file an EEO complaint. Mitchell responded: "Do I look — do whatever you want. I don't care." *Id.* at 125:8-10.

- In early 2008, Mehta testified that she had an argument with Mitchell about her work restrictions. Mitchell stated: "The doctor says one thing, you say another. Between you and your doctor, you should have it straightened out by now." *Id.* at 129:14-16.

- On an unspecified date, Mehta told Mitchell that she was going to file another EEO complaint. Mitchell said: "Do I look scared to you? Whatever, whatever, do whatever you want. Get out of my office." *Id.* at 128: 19-21.

Mehta has not presented direct evidence sufficient to establish a causal link between her protected conduct and the adverse employment actions that she suffered. None of these statements evince retaliatory animus with respect to any protected activity. There is no evidence to link any disciplinary actions taken by the Postal Service to the filings or threats of filing EEO complaints. Indeed, the discipline was imposed by Mehta's direct supervisor Yim, not Mitchell; and in any event, the record does not support Mehta's claim that Mitchell told Mehta that she was going to deny her FMLA leave because she "filed EEOC charges about her back injuries." Pl.'s Am. Counter

Statement of Facts at 13, ¶ 45. At best, these statements show that Mitchell harbored some hostility against Mehta.

42 U.S.C. § 2000e-3 was not intended to circumscribe all forms of retaliation; Congress specifically enacted the legislation to prevent retaliation against individuals engaging in protected conduct. *See Burlington Northern & Santa Fe Railway Co.*, 548 U.S. 53, 68 (2006) ("The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms."). In this case, the direct evidence, which consists of the above statements, does not show that Mehta's supervisors were motivated to retaliate against her because she complained or threatened to complain about discrimination. The evidence simply fails to show the essential nexus between the adverse employment action and Mehta's protected conduct.

Mehta has also failed to prove retaliatory animus by way of circumstantial evidence based on the timing of her discipline. In this regard, Mehta initiated contact with the Postal Service EEO Office on August 11, 2005 to complain about discrimination on account of her race, gender, and disability that she had allegedly suffered in the workplace.[15] She then filed a formal complaint with the Postal Service EEO Office on September 19, 2005. Thereafter, over a year later, Mehta was issued: (1) a "Letter of Warning" dated November 28, 2006 for unexcused absences occurring between October 30 and November 2, 2006; (2) a "Notice of Seven Day Suspension" dated March 29, 2007 for unsatisfactory attendance in February and March 2007; (3) a "Notice of

---

[15] Mehta requested that the EEOC conceal her identity during its initial investigation. Def. Mem. in Supp. of Mot. to Dismiss (Doc. No. 12), Def. Ex. 3. The burden rests with the plaintiff to show that her employer actually had knowledge of her protected conduct. *See Byers v. HSBC Fin. Corp.*, 416 F. Supp. 2d 424, 440 (E.D. Va. 2006). Mehta has not shown that the Postal Service ever had knowledge of this complaint.

Fourteen (14) Day Paper Suspension" dated June 8, 2007 for eight unscheduled absences occurring in April and May 2007; and (4) a "Notice of Removal" dated July 11, 2008 for five unscheduled absences accumulated after the June 8, 2007 paper suspension. Mehta also claims that she was subjected to approximately fifteen Pre-Disciplinary Interviews ("PDI")[16] after the filing of her September 2005 EEO complaint.

Courts have viewed adverse actions taken after protected activity as probative of a causal connection if the adverse actions occurred shortly after an employer learned of the protected activity. *See Pascual v. Lowe's Home Ctrs., Inc.*, 193 Fed. Appx. 229, 233 (4th Cir. 2006). The evidence shows, however, that Mehta had been the subject of several adverse actions that predated the filing of her EEO complaint. Mehta received her first "Letter of Warning" for unexcused absences on September 13, 2005, nearly a week before her supervisors had knowledge of her complaint. Additionally, Mehta had been subjected to a pre-disciplinary interview for her failure to timely report an on-the-job injury she sustained in January 2005 and had been issued a 7-day paper suspension for her failure to report her injury as an "off-the-job" injury on March 16, 2005. Mehta was also denied work and sent home before the filing of her EEO complaint. In fact, this was the pattern that occurred for approximately seven months before Mehta's first instance of protected conduct in September 2005. Because adverse actions had been taken against Mehta before the filing of her EEOC complaint, one cannot infer retaliatory animus from the other similar, adverse employment actions taken against her over a year after the filing of the EEO complaint. *See Duncan v. Washington Metro. Area Transit Auth.*, 425 F. Supp. 2d 121, 128 (D.D.C. 2006) (decision to terminate employee was made before the

---

[16] A PDI is a meeting between a supervisor, an employee, and usually a union representative prior to the imposition of formal discipline.

filing of EEOC complaint); *Kendrick v. Penske Trans. Svcs.*, 220 F.3d 1220, 1234-35 (10th Cir. 2000) (no causal connection where union grievance was filed two days after employee was discharged).

Mehta's case is unlike recent cases where courts have found a causal connection to exist even though the plaintiff had a disciplinary history that predated his or her protected conduct. In *Hamilton v. General Elec. Co.*, 556 F.3d 428 (6th Cir. 1999), for example, the Sixth Circuit held that an employee's prior disciplinary history did not foreclose the possibility of retaliatory animus when the employer increased its scrutiny of the employee after the filing of an EEOC complaint. In that case, the Sixth Circuit found the fact that the employer *increased* its scrutiny of the plaintiff after the filing of the complaint to be "critical." *Id.* at 436. In this case, however, Mehta has not made any allegation that her relationship with her supervisors changed after her instances of protected conduct. The record demonstrates that Mehta had a well-developed disciplinary record prior to the filing of her first EEO complaint and that Mehta continued to augment that record after the filing of that complaint. Thus, the Court finds that Mehta has failed to provide evidence sufficient to make out a *prima facie* case of retaliation.

### 2. Legitimate, Non-Discriminatory Business Reason

Mehta's failure to make out a *prima facie* case of discrimination is fatal to her claim. Nevertheless, the Court finds even were there sufficient evidence to make out a *prima facie* case of retaliation, the Postal Service has articulated legitimate, non-discriminatory reasons for the adverse actions taken against Mehta.

The Postal Service claims that Mehta was disciplined for excessive absenteeism and has provided records of these disciplinary actions. Because employers have a right to

take disciplinary action against employees who either report to work late or do not report at all, the Court finds that the Postal Service has offered a legitimate, non-discriminatory reason for disciplining Mehta. *See Warren v. Halstead Indus., Inc.*, 802 F.2d 746, 756 (4th Cir. 1986); *Brown v. Triton Sec.*, No. 1:04-cv-1544, 2005 U.S. Dist. LEXIS 25885 at *13 (E.D. Va. Oct. 19, 2005). The burden now shifts to Mehta to prove that the Postal Service's reason for the discipline was a pretext for unlawful retaliation.

### 3.    Pretext for Retaliation

Mehta argues that the Postal Service's reason for taking adverse actions against her is a pretext for unlawful retaliation. Specifically, Mehta claims that her supervisors "engaged in disparate treatment by disciplining Plaintiff but not other employees with similar or worse attendance records." Pl.'s Am. Counter Statement of Facts at 15, ¶ 51. Mehta also argues that her supervisors fabricated her disciplinary record by charging her with absences that should have been covered by the Family and Medical Leave Act. *Id.* at 8, ¶ 23.

Although Mehta was the only employee who received a Notice of Removal in 2007,[17] Mehta has not offered any evidence to show that this notice was based on any unlawful motives. Mehta has not presented the Court with any evidence whatsoever concerning the disciplinary history of other employees who had a significant number of absences.[18] Absent this evidence, the Court cannot determine whether Mehta was in fact

---

[17] It appears to be undisputed that Mehta was in fact the only employee at the Springfield branch who was issued a Notice of Removal during 2007.

[18] Mehta relies on a document titled "Final Agency Decision 4K-220-0045-07" to show that other employees in the Springfield post office had a significant number of absences. However, the document contains a footnote stating that "[t]he disciplinary records for the

treated differently from those employees. The Court can determine, however, that the record of absenteeism that the Postal Service relied on to issue the Notice of Removal in July 2007 in fact existed. The record indicates that Mehta took unscheduled leave, leave without pay, or was AWOL or late a total of thirty times between July 9, 2005 and June 29, 2007 and was disciplined before her removal on five separate occasions because of those absences. Mehta claims that these absences were contrived by her supervisors as part of a conspiracy to have her terminated. *Id.* at 9; Mehta Decl. at 16. However, Mehta acknowledges that her supervisors engaged in similar conduct that predated her protected activity.[19] In fact, Yim and Mitchell denied Mehta work assignments more than six months before her first instance of protected conduct. There is no evidence that the reasons relied upon by the Postal Service to discipline Mehta were not in fact the true reasons for their actions or that their actions were influenced by legally impermissible criteria.[20] *See St. Mary's Honors Ctr. v. Hicks*, 509 U.S. 502 (1993).

## IV. CONCLUSION

The Court concludes that Plaintiff has failed to prove the existence of a genuine issue of material fact and the Postal Service is entitled to judgment as a matter of law. The Court therefore grants Defendant's Motion for Summary Judgment.

A separate Order will issue.

---

other employees were not included in the investigative report." *See* Final Agency Decision 4K-220-0096-05 (Doc. No. 54).

[19] Mehta claims that she was denied work and sent home by her supervisor, Sonny Gleason, from February 23 to March 3, 2005. Mehta Declaration at 3, ¶ 21, 24.

[20] The issue in this case is not whether Mehta's absences were justified. Instead, the inquiry is whether the employer's adverse actions were triggered by Mehta's protected conduct.

_____
/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
June 4, 2009

**Statement of Material Facts as to Which There Is No Dispute**

1. Plaintiff began working as a Letter Carrier for USPS in 1998 at the post office in Springfield, Virginia. Compl., No. 07-1257, ¶ 12.

2. From February to October 2005, Cindy Mitchell ("Mitchell") was the Acting Manager of the Springfield, Virginia post office where Plaintiff was employed. In that capacity, Mitchell served as Plaintiff's second-line supervisor. Compl. No. 08-220, ¶ 16. Mitchell was detailed to another post office in October 2005, but returned to the Springfield post office (and to her position as Mehta's second-level supervisor) in October 2006, and remained there for the time period relevant to this lawsuit.

3. Beginning in March 2005, Chi "Erick" Yim became Mehta's first-line supervisor at the Springfield post office. Mem. in Supp. of Def. Mot. for Summ. J. ("Def. Br."), Ex. 56; Deposition of Chi "Erick" Yim at 43. After May 2005, Yim remained Mehta's first-line supervisor for all times relevant to this action.

4. On September 1, 1999, Mehta filed a Form CA-2, "Notice of Occupational Disease and Claim for Compensation" with the U.S. Department of Labor's Office of Workers' Compensation Programs ("OWCP"). Def. Br., Ex. 1. Mehta's initial CA-2 alleged that she had sustained a "back sprain." Def. Br., Ex. 2.

5. On February 8, 2005, Mehta filed another notice of injury. Def. Br., Ex. 4. Mehta was delivering mail on January 21, 2005. As a letter carrier, Mehta was required to report any injury immediately. Def. Br., Ex. 9. Because she waited weeks to do so, her then-supervisor Sonny Gleason ("Gleason") gave her a "paper" seven day suspension, i.e. a "suspension" for purposes of documenting the incident in Mehta's file, but which allowed Mehta to continue to come to work and not lose any pay or benefits.

6. In late March 2005, Mehta submitted to her supervisor a CA-17 "Duty Status Report" form describing her restrictions. Def. Br., Ex. 10. The form stated that Mehta could lift/carry three pounds intermittently; stand, walk, climb, kneel, bend/stoop, pull/push, twist, and grasp intermittently, and otherwise perform the normal functions of her job. Mehta's supervisor provided her with an "offer of modified assignment (light duty)" with the following physical requirements:

| Lifting/carrying 3 lbs. | 8 hours intermittent |
|---|---|

---

[1] These facts are taken from the section titled "Undisputed Material Facts" set forth on pages 4 through 16 of Defendant's "Memorandum of Law in Support of Defendant's Motion for Summary Judgment," (Doc. No. 50), and "Plaintiff Veenu Mehta's Amended Counter Statement of Facts in Support of Her Opposition to Defendant's Motion for Summary Judgment." (Doc. No. 78).

| | |
|---|---|
| Walking | 8 hours intermittent |
| Standing | 8 hours intermittent |
| Fine manipulation | 2 hours intermittent |
| Climbing | 8 hours continuous |
| Driving a vehicle | 8 hours intermittent |
| Reaching above shoulders | 8 hours intermittent |
| Kneeling, bending, stooping | 8 hours intermittent |
| Twisting | 8 hours intermittent |
| Pushing/pulling | 2 hours intermittent |
| Simple grasping | 8 hours intermittent |
| Sitting | 1 hour continuous |

7. Mehta rejected the offer, writing on the bottom of the form that she "need[ed] to take this limited offer to my doctor and check with him []. Def. Br., Ex. 11. Mehta returned with another CA-17 Duty Status Report signed by her doctor, which was dated March 30, 2005. Def. Br., Ex. 12. The only apparent difference between the March 30 form and the one she submitted days earlier was that the new form clarified that Mehta could grasp and conduct fine manipulation for eight hours per day (which presented no apparent change from the previous form), reach above her shoulder for two hours a day (a departure from the form previously submitted), and drive a motor vehicle for four hours per day (another departure from the form previously submitted).

8. On March 30, 2005, Mehta also provided a letter signed by her physician, Dr. Spencer Tseng ("Tseng"), who stated that when he saw Mehta, she was then "limited by pain on several activities," that she was "not to case or carry mail at this and would benefit from desk duty." Def. Br., Ex. 13. The day after Tseng's letter, a Postal Service physician wrote Tseng and asked him to opine as to the cause of Mehta's back pain, explain why the recommendations on Mehta's March 30, 2005 CA-17 form were more restrictive than they were a month earlier, describe the results of any MRI, CT, or x-ray studies, and various other questions related to Mehta's condition, treatment, and diagnosis. Def. Br., Ex. 14.

9. Tseng responded to some of these questions on May 17, 2005. Def. Br., Ex. 17. With respect to the fact that the most recent restrictions were more restrictive than previous restrictions, Tseng wrote that trials of increasing her activity worsened her condition. *Id.*

10. The CA-17 Duty Status Report forms Mehta submitted illustrate that her condition did worsen initially, but then improved. On May 5, 2005, she submitted a form that indicated, *inter alia*, she could carry only three pounds for four hours per day intermittently. Def. Br., Ex. 15. The same day, Mitchell gave Mehta an offer of modified assignment, which Mehta accepted. Def. Br., Ex. 16. On June 3, 2005, Mehta submitted another form that indicated, *inter alia*, that she could lift five pounds per day (all day) intermittently. Def. Br., Ex. 18. Donna Bradley ("Bradley"), Mehta's second-line supervisor during Mitchell's absence, gave Mehta an offer of modified assignment, which Mehta accepted. Def. Br., Ex. 19.

11. By July 2005, Mehta's condition had continued to improve. X-ray examinations revealed no abnormalities in her vertebral bodies, joint spaces, bones, or soft tissue in her back. Def. Br., Exs. 20, 21.

12. The CA-17 forms Mehta submitted after July 12, 2005 indicate that her condition continued to improve. On August 15, 2005, Mehta submitted a form that indicated, *inter alia*, that she was able to carry five to ten pounds per day (all day), stand continuously for three hours per day, twist intermittently for two hours each day, and reach above her shoulders continuously for three hours per day. Def. Br., Ex. 23. Otherwise, Tseng indicated that Plaintiff was able to meet the physical requirements of her job for sitting, climbing, kneeling, bending, stooping, pulling, pushing, and driving a vehicle. Yim, Mehta's first-line supervisor, presented her with an offer of modified assignment, which Mehta accepted. Def. Br., Ex. 24.

13. On June 23, 2006, Mehta told her supervisors that she re-injured her back while conducting an inspection of her Postal Service vehicle. Def. Br., Exs. 27-31.

14. A CA-17 form submitted on July 16, 2006 indicated that Mehta could lift ten pounds for four hours per day continuously (and fifteen pounds intermittently), twist intermittently for one hour per day, reach above her shoulders for three hours per day, but could otherwise perform all her job duties. In early August 2006, Mehta submitted another CA-17 form (based on an examination that occurred on July 31, 2006) signed by Dr. Tseng that indicated, *inter alia*, that she should lift only five pounds for one hour per day intermittently.

15. On August 15, 2006, Postal Service physician Dr. Bruce Butler wrote Dr. Tseng and asked questions about the August 2006 CA-17 form. Def. Br., Ex. 39. The Postal Service never received a response. Defendant provided Mehta with some modified assignments, some of which she accepted.

16. Beginning in November 2006, Mehta and her supervisors entered into a weeks long back and forth in which they disagreed about the duties Mehta could perform without violating her restrictions. On November 28, 2006, Mehta submitted a CA-17 form stating that she could lift ten pounds for three hours per day intermittently, stand for three hours per day intermittently, reach above her shoulders for three hours per day,

drive a vehicle for four hours per day intermittently, and could not kneel, bend, twist or stoop at all. Mehta's supervisors gave her an offer of modified assignment that would require her to deliver mail for four hours per day. Def. Br., Exs. 45, 47, 49.

17. Mehta declined this offer, stating that the requirement to case her route and deliver mail for four hours per day exceeded the limitations on carrying and pulling.

18. Regular, dependable attendance (or at least requesting permission well in advance) is especially important in the Postal Service. Def. Br., Ex. 55. When someone is absent, the supervisor must call another employee from another post office to help or call upon employees in the absentee's post office to help. Def. Br., Ex. 54; Mehta Dep. at 24. The Postal Service makes a distinction between two types of approved leave: scheduled leave and unscheduled leave. Scheduled leave is requested and approved in advance; unscheduled leave is when the employee has "called in at the last minute." Def. Br., Ex. 54; Deposition of Veenu Mehta at 26.

19. The record discloses five occasions where Mehta was disciplined for unscheduled absences. Def. Br., Exs. 57-61.

20. Mehta was late on July 9, 2005, took emergency annual leave on July 22, 2005, and annual leave in lieu of sick leave the following day, which was July 23, 2005. On August 23, 2005, Yim was at work when Mehta called in sick and told him she was "using FMLA" leave.

21. Mehta did not lose any pay or benefits as a result of her discipline.

22. Yim issued Mehta a letter of warning on November 28, 2006 for being absent without leave ("AWOL") from October 30 to November 2, 2006. Def. Br., Ex. 58. For those days, Mehta was not at work because she claims she was waiting for her doctor to get her an updated CA-17 form. Def. Br., Ex. 56. Mehta did not request leave for any of those dates.

23. On March 29, 2007, Yim issued Mehta a "Notice of Seven Day Paper Suspension" for unsatisfactory attendance and failure to meet attendance requirements. Def. Br., Ex. 59.

24. Yim disciplined Mehta again on June 8, 2007 for additional unscheduled absences occurring between April 10 and May 22, 2007. Def. Br., Ex. 60.

25. Mehta had additional absences during the three weeks following her 14-day paper suspension. Def. Br., Ex. 61. Mehta was then issued a Notice of Removal, which she grieved via the proceedings afforded to her by the Postal Service collective bargaining agreement. On November 27, 2007, an arbitrator set aside the removal and ordered that Mehta be returned to work with all pay and benefits restored. Compl. No. 08-220, ¶ 145.

26. When Mitchell told Mehta that she was filing an EEO complaint, Mitchell said: "Do I look – do whatever you want. I don't care." Mehta Dep. at 125.

27. In March 2005, Mehta would or could not perform the tasks Mitchell asked her to do and Mitchell became upset. Mitchell raised her voice and said: "The doctor says one thing, you say another. Between you and your doctor, you should have it straightened out by now." *Id.* at 129.

28. In August 2005, Mitchell told Yim to "go sit her down." Mitchell was referring to Mehta. *Id.*

29. In October 2006, Mehta was filling out a form. Mehta told Mitchell to look at the form and that Mitchell did not want to answer her questions. *Id.* at 129-30. Mitchell told Mehta that she was "making things hard for herself." *Id.* at 130.

30. Mehta told Mitchell that she was going to call the Office of the Inspector General. Mitchell replied: "Whatever, do whatever you want. Do I look scared to you? Whatever. If you're not going to accept this job offer, you know, I'm going to get your claim denied." *Id.* at 125-26. Mitchell did not use profanity or threaten Mehta and remained seated during the entire exchange. *Id.*

31. On February 16, 2007, Mitchell told Mehta: "You mean nothing to me. Get that through your head." Mehta said that she had a FMLA on file and Mitchell said: "Yeah, I'll give you FMLA. No FMLA for you period." Mitchell also said: "Write it down, no FMLA for you period." Mitchell then escorted Mehta out of the post office. *Id.* at 127.

32. In 2008, Mehta went to Mitchell's office and asked why she was being placed on Code 49 when she repeatedly asked to be placed on Code 59. Mitchell said: "You're not the one who asked for Code 59." Mehta asked for documentation and told Mitchell that she was going to file another EEO complaint. Mitchell said: "Do I look scared to you? Whatever, whatever, do whatever you want. Get out of my office." *Id.* at 128.

33. Mitchell never physically threatened Mehta, used profanity towards her, or made any derogatory comments about any alleged disability that Mehta witnessed. *Id.* at 125.